UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at CHATTANOOGA

LISA M. CHAPMAN and )
MITCHELL DEWAYNE CHAPMAN )
)
Plaintiffs, )
) No. 1:04-CV-237
v. )
) Judge Curtis L. Collier
AMSOUTH BANK )
)
Defendant. )

**M E M O R A N D U M**

This case arises out of Plaintiff Lisa M. Chapman's ("Plaintiff") employment with Defendant

AmSouth Bank ("Defendant"), during which she alleges she was subjected to a sexually harassing

hostile work environment and retaliated against in violation of the Tennessee Human Rights Act

("THRA"), Tenn. Code Ann. §§ 4-21-101 to 4-21-1004.  Additionally, Plaintiff has asserted an

intentional infliction of emotional distress claim and Plaintiff Mitchell Chapman ("Mr. Chapman"),

Plaintiff's spouse, has asserted a loss of consortium claim. Before the Court is Defendant's Motion

for Summary Judgment (Court File No. 17).  Plaintiff and Mr. Chapman filed a response (Court File

No. 25), and Defendant filed a reply (Court File No. 33).  For the following reasons, the Court will

**GRANT IN PART** and **DENY IN PART** Defendant's motion for summary judgment.  The Court

will allow Plaintiff's claims for hostile work environment and retaliation to proceed to trial but the

Court will **DISMISS** the intentional infliction of emotional distress and loss of consortium claims.

I.       STANDARD OF REVIEW

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Initially, the burden is on the moving party to conclusively show no genuine issues of material fact exist, *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003), and the Court must view the evidence and draw all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986). However, the nonmoving party is not entitled to a trial merely on the basis of allegations, but must come forward with some significant probative evidence to support its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to summary judgment. *Id.* at 323, 106 S. Ct. at 2552.

The Court determines whether sufficient evidence has been presented to make the issue of fact a proper jury question, but does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986); *Weaver v. Shadoan*, 340 F.3d 398, 405 (6th Cir. 2003). The standard for summary judgment mirrors the standard for directed verdict. *Anderson*, 477 U.S. at 250, 106 S. Ct. at 2511. The Court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52, 106 S. Ct. at 2512. There must be some probative evidence from which the jury could reasonably find for the nonmoving party. If the Court concludes a fair-minded

2

jury could not return a verdict in favor of the nonmoving party based on the evidence presented, it may enter a summary judgment. *Id.*; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

## II.    **RELEVANT FACTS**

The facts of this case, viewed in the light most favorable to Plaintiff, are as follows:

Plaintiff began working for Defendant as a financial service associate in 1999 at a branch in Fort Oglethorpe, Georgia (Court File No. 17, Exh. A, Court File No. 25, Exh. P, Court File No. 33, Exh. A, Deposition of Lisa M. Chapman ("Chapman Dep.") at 54, 56-57). As a financial service associate with Defendant, Plaintiff received yearly pay raises and was given an award for providing excellent customer service (*Id.* at 142; Court File No. 25, Exh. A). During her time in Fort Oglethorpe, Plaintiff received training on Defendant's Sexual Harassment Policy (Chapman Dep., Exh. 8) and was given a copy of the Policy (Chapman Dep. 104-108, Exhs. 7-9). In 2002, Plaintiff transferred to a branch in East Ridge, Tennessee, where she continued working as a financial service associate (*Id.* at 67, 69). Then, in March 2003, Plaintiff was offered a position as a financial service associate at the Brainerd South branch where Randy Moore ("Moore") was the manager and Cindy Black Vincent ("Vincent") was the assistant manager (*Id.* at 64-65, 71-73). Plaintiff accepted the position and transferred in April 2003 (*Id.*). Her responsibilities as a financial service associate included opening, servicing, and closing customer accounts and general customer service (*Id.* at 54-55, 71-72). She was also responsible for processing loan documents, handling IRAs, and setting up check cards (*Id.* at 41-43). A financial service associate is a "platform position" distinguishable from a teller position that handles deposits and withdrawals from customer accounts (*Id.* at 41, 55).

3

While working at the Brainerd South branch, Plaintiff was subjected to inappropriate conduct by her supervisor, Moore. Specifically, Moore engaged in the following conduct:

(1) Moore would talk about having sex with female customers and other women[1] about once every other week;

(2) Moore would pull at his crotch every day while at Plaintiff's desk or while Plaintiff was at his desk;

(3) On a weekly basis, Moore would "side hug" Plaintiff in front of co-workers in such a manner that would make Plaintiff's breasts touch Moore's chest;

(4) Moore would grab Plaintiff's upper arm and squeeze it in an affectionate way at least twice every week at her desk or behind the teller line;

(5) Moore would very seldom rub Plaintiff's shoulders;

(6) Moore would talk about not having sex with his wife about once a month and he mentioned the frequency of sex with his wife before they were married; and

(7) Moore would sit and stare at Plaintiff in an uncomfortable manner three or four times a week.

(*Id.* at 20-22, 122-24; Court File No. 17, Exh. D., Court File No. 25, Exh. W, Court File No. 33, Exh. D, Deposition of Cindy Vincent ("Vincent Dep.") at 40-43, 65). Plaintiff's first comment to someone else about Moore's conduct came when she asked Vincent if she had seen Moore pulling at his crotch (Chapman Dep. at 112; Vincent Dep. at 66). Plaintiff also had conversations with Vincent about Moore's attempts to discuss the amount of sex he was having with his wife (Vincent Dep. 63-64). Vincent contacted Griffin to complain about Moore, however, the complaints centered around Moore inputting loans improperly and did not include any complaints about Moore's harassing conduct (Vincent Dep. at 39, 46, 63). Plaintiff called a 1-800 number[2] provided by the Defendant on its intranet to complain about Moore's behavior but the person she spoke with told her

---

[1] Moore's comments about having sex with other women do not appear to be details about sexual intercourse itself. Rather, the comments seem to be more general in nature in that the comments refer to Moore's desire to have sex with women he saw. Plaintiff describes Moore's comments as "I wish I could get a hold of that"(Chapman Dep. at 123).

[2] Plaintiff does not remember when this phone call took place, only that she made the call before she spoke with her husband in late September (*see Id.* at 111).

4

she needed to contact the local human resource manager (*Id.* at 104-06, 109-10; Court File No. 25, Exh. Q, Deposition of Mitchell Dewayne Chapman ("Mr. Chapman Dep.") at 22). On the weekend of September 27, 2003, Plaintiff told her husband about Moore's conduct and the 1-800-number phone call (Mr. Chapman Dep. at 21-23). Plaintiff did not attempt to make any further complaints. She believed she would not get help if she did complain to local management because Moore's boss/friend, Jeff Standridge, got a bank employee pregnant and left his wife, and Moore's wife was an area branch operations manager ("ABOM") (*Id.* at 24; Chapman Dep. at 112-14, Exh. 10). Instead of complaining, she decided to resign. (Chapman Dep. at 111-12). On September 29, 2003, Plaintiff showed her resignation letter to Vincent and then faxed it to human resources (*Id.* at 112-14). The letter refers to Moore's business practices and then states "[h]e has made comments about his personal life that is totally inappropriate. I feel I have no one I can alert to this matter. . . since it involves his home life. I feel this immoral. I will not continue to work with him in this environment" (*Id.* at Exh. 10). Upon receipt of the resignation letter, Defendant's Area Human Resources Manager, Don Griffin ("Griffin"), came to the Brainerd South branch to meet with Plaintiff and Vincent (*Id.* at 113-114). Plaintiff and Vincent told Griffin, among other things, Moore talked about his sex life with his wife (Chapman Dep. at 114-15; Vincent Dep. at 117-18).

A few days after meeting with Plaintiff and Vincent, Griffin met with Moore and told him he was there to terminate him but he accepted Moore's resignation (Court File No. 17, Exh. E, Court File No. 25, Exh. R, Court File No. 33, Exh. E, Deposition of Donald W. Griffin ("Griffin Dep.") at 104-06, 118-20). Griffin requested Plaintiff to reconsider her resignation, which she did. Plaintiff remained employed as a financial service associate at the Brainerd South branch (Chapman Dep. 118; Griffin Dep. 147). Latrice Sylvester ("Sylvester") became the new Brainerd South branch

manager (Chapman Dep. at 75). Sylvester had no knowledge of any complaints being made against Moore and she would not allow Plaintiff or Vincent to fill her in on what happened. (Court File No. 17, Exh. C, Court File No. 25, Exh. V, Court File No. 33, Exh. B, Deposition of Latrice Sylvester ("Sylvester Dep.") at 63-65). Sylvester did not acknowledge Plaintiff with a smile when they first met and she told Plaintiff on several occasions if she was not happy at the bank, she could leave (*Id.* at 75, 128). Further, after Sylvester became the branch manager, Plaintiff's responsibilities increased and if Plaintiff missed a day, she was not provided with back up help like other employees were (*Id.* at 128). During branch meetings, Sylvester would single out areas of improvement for the platform which necessarily meant Sylvester was singling out Plaintiff, the only platform employee at that branch (*Id.*). Also, after Sylvester became manager, Vincent requested a transfer because she was not comfortable after everything that had happened with Moore (Vincent Dep. at 176-78).

In October 2003, about three to four weeks after Moore resigned, Plaintiff processed a check card request for Eric Watkins ("Watkins"), a customer, on an account that listed him as the sole owner. Watkins was also a beneficiary on another account, a custodial account, but was not authorized to make withdrawals on the custodial account. Plaintiff linked the check card to the custodial account giving him access to funds he should not have had access to (Chapman Dep. at 83-84, 90-95; Sylvester Dep. at 126-28). Watkins proceeded to withdraw over $1,000.00 on the custodial account with the check card linked by Plaintiff (Court File No. 33, Affidavit of Michelle Spencer ("Spencer Aff.") at ¶ 6; Sylvester Dep. 127-29, 162-66; Court File No. 17, Exh. B., Court File No. 25, Exh. S, Court File No. 33, Exh. E, Deposition of Tracy Jones ("Jones Dep.") at Exh. 5-7). Plaintiff had no prior losses greater than $1,000.00 (*see* Court File No. 25, Exh. K). Once the mistake was discovered, Plaintiff explained to Tracy Jones ("Jones"), an ABOM, how she had issued

6

a check card to Watkins. Jones told Plaintiff there must be a problem with the computer system because it should not have allowed Plaintiff to make such a mistake (Chapman Dep. at 94, 163-64). Further, because Watkins had an owner's account, a financial service associate would be more likely to link the check card (Moore Dep. at 110-11; Jones Dep. at 68-69; Sylvester Dep. at 135-36).[3] Another employee, Anitra Jackson, also linked a check card to the custodial account that resulted in a loss of about $600.00 (Spencer Aff. at ¶ 6; Jones Dep. at Exh. 6-7). On February 14, 2005 Defendant terminated Plaintiff's employment pointing to Plaintiff's violation of Defendant's "Non-credit Loss Policy."[4] (Chapman Dep. at 93-96). Sylvester recommended Plaintiff's termination but the ultimate decision to terminate was made by Griffin (Griffin Dep. at 53). Defendant has had other employees with losses in excess of $1,000.00 that were not terminated (Court File No. 25, Exhs. H, I, J; Jones Dep. at 142-153).

## III. DISCUSSION

### A. Sexual Harassment Claim

In her complaint Plaintiff alleges Moore's actions created a hostile work environment and because he was her supervisor, Defendant is vicariously liable for his actions. Defendant moves for

---

[3] Viewing the facts in the best light possible for Plaintiff, it appears when Plaintiff was setting up the check card she would not have known the other account was custodial by looking at the computer screen during the check card set up process. Instead, she would have had to go to another computer screen or check the individual account to see if it was custodial (*see, e.g.* Moore Dep. at 111).

[4] Defendant's non-credit loss policy provides "any one time cash item loss of $1000 or greater leaves the employee subject to termination" (Court File No. 25, Exh. F, p. 3). When a loss greater than $1000 occurs, "the employee is terminated after the Branch Manager has consulted with the Consumer Banking Manager or Area Human Resources and it has been determined there are no mitigating circumstances to prevent the termination of the employee" (*Id.* at 4).

summary judgment on Plaintiff's claims, contending (1) Plaintiff was not subjected to a hostile work environment on the basis of her sex; and (2) Defendant responded promptly and appropriately to her complaint of discrimination. The court will **DENY** Defendant's motion for summary judgment on Plaintiff's THRA hostile work environment claim.

### 1. Hostile Work Environment

As a preliminary matter, the Court notes the Tennessee Supreme Court has repeatedly recognized the application of federal law to THRA cases. *See, e.g.*, *Carr v. United Parcel Serv.*, 955 S.W.2d 832, 834-35 (Tenn. 1997) ("Although the language of Title VII and the THRA differ slightly, it is clear that the legislature intended the THRA to be coextensive with federal law. We, therefore, may look to federal interpretation of Title VII for guidance in enforcing our own anti-discrimination statute. We, however, are neither bound by nor limited by federal law when interpreting the THRA") (citations omitted); *Frizzell v. Southwest Motor Freight Co.*, 154 F.3d 641, 646 (6th Cir. 1998); *Parker v. Warren County Util. Dist.*, 2 S.W.3d 170, 176 (Tenn. 1999). Therefore, the Court analyzes Plaintiff's THRA sexual harassment claim under the relevant federal standards.

Under the THRA, it is unlawful for covered employers to "[f]ail or refuse to hire or discharge any person or otherwise to discriminate against an individual with respect to compensation, terms, conditions or privileges of employment because of such individual's . . . sex . . . ." Tenn. Code Ann. § 4-21-401(1). A plaintiff may establish a violation of the THRA by proving an employer's discrimination based on sex created a hostile or abusive work environment. *See Meritor Savings Bank v. Vinson*, 477 U.S. 57, 66 (1986); *Black v. Zaring Homes, Inc.*, 104 F.3d 822, 825 (6th Cir. 1997); *Parker,* 2 S.W.3d at 176. Discrimination in this form occurs "[w]hen the workplace is

8

permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris*, 510 U.S. at 21 (citations and internal quotation marks omitted).

To make out a claim of hostile work environment sexual harassment, a plaintiff must present evidence sufficient, if true, to prove five elements:

(1) she is a member of a protected class;

(2) she was subjected to unwelcome harassment;

(3) the harassment complained of was based upon her sex;

(4) the harassment unreasonably interfered with the plaintiff's work performance or created a hostile or offensive work environment that was severe and pervasive; and

(5) the employer is vicariously liable

*See Fenton v. HiSAN, Inc.*, 174 F.3d 827, 829-30 (6th Cir. 1999). Defendant argues element (4) has not been met because Moore's conduct was not severe or pervasive and element (5) has not been met because Defendant took prompt and appropriate corrective action.

### a.       Severe and pervasive work environment

In *Harris v. Forklift Sys., Inc.*, 510 U.S. 17 (1993), the Supreme Court considered the definition of a hostile work environment. With respect to the severity of the conduct required to be actionable under Title VII, the Court stated:

> [M]ere utterance of an . . . epithet which engenders offensive feelings in a employee does not sufficiently affect the conditions of employment to implicate Title VII. Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment — an environment that a reasonable person would find hostile or abusive — is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.

But Title VII comes into play before the harassing conduct leads to a nervous

breakdown. A discriminatorily abusive work environment, even one that does not seriously affect employees' psychological well-being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers. . . .

. . . Certainly Title VII bars conduct that would seriously affect a reasonable person's psychological well-being, but the statute is not limited to such conduct. So long as the environment would reasonably be perceived, and is perceived, as hostile or abusive there is no need for it also to be psychologically injurious.

This is not, and by its nature cannot be, a mathematically precise test. We need not answer today all the potential questions it raises.... But we can say that whether an environment is "hostile" or "abusive" can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive. But while psychological harm, like any other relevant factor, may be taken into account, no single factor is required.

*Harris*, 510 U.S. at 21-23.

Simple teasing, offhand comments, and isolated incidents, unless extremely serious, will not amount to discriminatory changes in the terms or conditions of employment. *See Clark County School District v. Breeden,* 532 U.S. 268, 271 (2001)*; Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 790 (6th Cir. 2000). In any given case, "[t]he issue is not whether each incident of harassment standing alone is sufficient to sustain the cause of action in a hostile environment case, but whether — taken together — the reported incidents make out such a case. The work environment as a whole must be considered rather than a focus on individual acts of alleged hostility." *Bowman v. Shawnee State University*, 220 F.3d 456, 463 (6th Cir. 2000) (citations and internal punctuation omitted).

10

In this case, looking at the alleged incidents of harassment as a whole, the Court believes Moore's behavior could be viewed as more than simple teasing, offhand comments, or isolated incidents. Many of the alleged incidents occurred on a frequent basis over approximately a four month period. Further, Moore did more than make a few offhand sexist remarks. Moore would half hug Plaintiff so Plaintiff's breasts would touch his chest, he would affectionately touch Plaintiff's arm, and he would uncomfortably stare at Plaintiff three or four times a week. Also, Moore would talk about wanting to have sex with female customers and his sex life, or lack of a sex life, with his wife. Moore's actions affected Plaintiff enough to cause her to call a 1-800 sexual harassment number, speak to the assistant manager, and to turn in a resignation letter. Although Moore never made a comment about wanting to have sex with Plaintiff, such a comment is not required to let this case proceed to trial. *See Black v. Zaring Homes, Inc.*, 104 F.3d 822, 826 (6th Cir. 1997) (noting "sex-based comments need not be directed at a plaintiff in order to constitute conduct violating Title VII"). Thus, the conduct alleged by Plaintiff, if true, was severe and pervasive enough to constitute sexual harassment under the THRA.

### b. Vicarious Liability

Defendant argues it cannot be held vicariously liable for Moore's actions because it exercised reasonable care to prevent and correct any harassing behavior. In making this argument, Defendant confuses the fifth element of Plaintiff's *prima facie* case with the affirmative defense discussed below. An employer is vicariously liable "for an actionable hostile work environment created by a supervisor with immediate (or successively higher) authority over the employee." *Clark v. UPS, Inc.* 400 F.3d 341, 348 (6th Cir. 2005) (quotation omitted); *see also Barna v. City of Cleveland*, No. 96-3971, 1998 WL 939884, at *5 (6th Cir. 1998) (stating [a]n employer is now

11

essentially strictly liable for workplace harassment by supervisors unless it can establish the affirmative defense). Here, Moore was Plaintiff's supervisor and he created the hostile work environment at the Brainerd South branch during work hours. Therefore, under Plaintiff's *prima facie* case, Defendant is vicariously liable for Moore's harassing behavior.

### c.    Affirmative Defense

Even if a plaintiff presents a *prima facie* case of hostile work environment sexual harassment, an employer can avoid liability if it successfully asserts an affirmative defense. *See Id.* at 348. However, the affirmative defense is not available "when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment" *Faragher v. City of Boca Raton*, 524 U.S. 755, 808 (1998). Plaintiff contends a tangible employment action took place when "she was terminated" (Court File No. 26, p. 23). The Court disagrees. Here, the harassment culminated in the termination of Moore, not Plaintiff. Upon receiving Plaintiff's letter of resignation, Griffin urged Plaintiff to reconsider, which she did. The only possible tangible employment action that culminated from Moore's harassment was Plaintiff's letter of resignation but even if the resignation was accepted it could not be a basis for finding a tangible employment action. *See Collette v. Stein-Mart, Inc.*, 126 Fed. Appx. 678, 682 (6th Cir. 2004) (unpublished) (explaining that a constructive discharge cannot serve as a tangible employment action for purposes of the *Ellerth-Faragher* affirmative defense) (citing *Pennsylvania State Police v. Suders*, 542 U.S. 129, ---, 124 S.Ct. 2342, 2351 (2004)). When Moore was still employed by the bank, he did not discipline Plaintiff or take any action against her nor did anyone successively higher in authority. Although Plaintiff was terminated over four months after Moore's resignation was

12

accepted, Plaintiff has not presented any evidence suggesting the harassment itself resulted in the termination. Rather, Plaintiff only gives evidence suggesting the termination was retribution for Plaintiff's complaints about Moore. Therefore, the Court concludes the alleged harassment did not culminate in Plaintiff's termination.

Since the harassment did not culminate in a tangible employment action, the Court now turns to the affirmative defense laid out in *Burlington Indus. v. Ellerth*, 524 U.S. 742 (1998). The Supreme Court in *Ellerth* stated:

> When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence. . . . The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

524 U.S. at 765.

Plaintiff argues Defendant has not satisfied either element. Admittedly, Defendant took swift corrective action once Plaintiff turned in her letter of resignation thereby possibly satisfying the first element of the affirmative defense. However, Defendant has not, for summary judgment purposes, met the second element of its affirmative defense. The second element requires the employer to show the employee unreasonably failed to take advantage of any preventive or corrective opportunities. *Id.* Here, Plaintiff attempted to call a 1-800 number from the intranet and was told to call the human resource department. She did not call the human resources department. Plaintiff did not call the numbers listed in the harassment policy and she did not complain to a supervisor about virtually all of the harassing behavior. Plaintiff argues it was reasonable for Plaintiff not to

take advantage of the harassment policy complaint procedures because "Moore's wife was an ABOM" and his supervisor/friend, Standridge, got another bank employee pregnant (Court File No. 26, p. 23). Defendant responds "whether Mr. Moore's wife was an ABOM or whether he was friends with his supervisor is immaterial and does not excuse Plaintiff's failure to utilize [Defendant's] harassment policy..." (Court File No. 33, p. 4). Viewing the facts in the best light possible for the plaintiff, a juror could find Plaintiff's failure to use the sexual harassment reporting procedures reasonable. *See Williams v. General Motors Corp*, 187 F.3d 553, 566 (6th Cir. 1999) (concluding reluctance to report the harassing incidents was entirely understandable considering one of the alleged aggressors was plaintiff's supervisor and plaintiff wanted to get along at work). Defendant has failed to carry its burden on the second element of the affirmative defense. Accordingly, the Court will **DENY** Defendant's motion for summary judgment on Plaintiff's hostile work environment claim.

### 2. Retaliation Claim

In her complaint Plaintiff alleges she was terminated from her employment with Defendant for complaining about sexual harassment. For the reasons discussed below, the Court will **DENY** summary judgment on Plaintiff's retaliation claim.

#### a. Prima Facie Case

To establish a *prima facie* case of retaliation, the Plaintiff must establish that:

(1) plaintiff engaged in activity protected by Title VII;
(2) defendant had knowledge of the plaintiff's exercise of protected activity;
(3) the defendant took an employment action adverse to plaintiff; and
(4) there was a causal connection between the protected activity and the adverse employment action.

14

*EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 862 (6th Cir. 1997); *Miller v. City of Murfreesboro*, 122 S.W.3d 766, 775 (Tenn. Ct. App. 2003). Once Plaintiff establishes her *prima facie* case, Defendant must then come forward with a nondiscriminatory reason for the adverse action. *Williams v. Nashville Network*, 132 F.3d 1123, 1131 (6th Cir. 1997). If Defendant produces such a reason, the burden then shifts back to Plaintiff to demonstrate the reasons offered are pretextual. *Id.*

Defendant attacks Plaintiff's *prima facie* case of retaliation. Defendant argues there is no causal link between her complaints about Moore in September 2003 and her termination in February 2004. A causal link may be shown through knowledge combined with closeness in time that creates an inference of causation. *Johnson v. University of Cincinnati*, 215 F.3d 561, 582-83 (6th Cir. 2000). However, the plaintiff cannot meet this burden merely by showing her participation in protected activity was followed by a discharge, even where the proximity in time between the two events is as short as three or six days. *Austin v. Shelby County Government*, 3 S.W.3d 474, 480-81 (Tenn. Ct. App. 1999) (citing *Thomason v. Better-Bilt Aluminum Prods., Inc.*, 831 S.W.2d 291, 293 (Tenn. Ct. App. 1992); *Mason v. Seaton*, 942 S.W.2d 470, 473 (Tenn. 1997); *Conaster v. Clarksville Coca-Cola Bottling Co.*, 920 S.W.2d 646, 648 (Tenn. 1995)). A plaintiff must produce sufficient evidence for the court to infer the employer would not have taken the adverse action had the plaintiff not engaged in protected activity. *Johnson,*, 215 F.3d at 582-83. In the current case, more than four months passed between the protected activity and Plaintiff's termination. This is a short enough time to infer a causal link, but not so short to compel a finding of a causal link. Therefore, the Court will look at the evidence presented by Plaintiff to see if a causal link can be inferred. Plaintiff argues her termination was a sham. Other employees at the bank had losses over $1,000.00 and were not

15

terminated. Also, the non-credit loss policy requires a consideration of mitigating circumstances. There appears to be several mitigating circumstances that were not considered or were given too little weight. Specifically, the computer system did not warn Plaintiff that Watkin's account was custodial and Watkins had an owners account which suggests he was not incompetent. Also, several other check cards had been issued to Watkins and at least one of these cards was linked to the same custodial account that resulted in $600.00 loss. No evidence is before this Court showing the employee who linked this card has been disciplined under the non-credit loss policy. Looking at the above evidence, the Court concludes sufficient evidence has been presented to infer a causal link. While it may be true Sylvester, who made the recommendation for Plaintiff to be terminated, had no knowledge of the protected activity, the final decision was clearly made by Griffin who did have knowledge of the protected activity. Thus, viewing this conflicting evidence in the best light possible for Plaintiff, the causal connection portion of Plaintiff's *prima facie* case has been met.

### b. Legitimate Nondiscriminatory Reason

Defendants have articulated Plaintiff was discharged because she violated the non-credit loss policy by linking a check card to a custodial account which resulted in a non-recoverable loss to the bank in excess of $1,000.00. While this reason, as discussed directly above, has been cast into doubt by Plaintiff, Defendant need not prove its reason in this step of the analysis, but must merely articulate a valid rationale. *Hartsel v. Keys*, 87 F.3d 795, 800 (6th Cir. 1996). Defendants have met their burden here.

### c. Pretext

Since Defendant has met its burden of production, showing a legitimate, non-discriminatory reason for terminating Plaintiff, the burden shifts back to Plaintiff to prove, by a preponderance of

the evidence, the reason articulated by the employer is not the true reason but merely a pretext for unlawful discrimination. To show pretext, Plaintiff "must produce sufficient evidence from which the jury may reasonably reject the employer's explanation." *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1083 (6th Cir.1994). To do so, Plaintiff is required to show by a preponderance of the evidence either (1) the proffered reasons had no basis in fact, (2) the proffered reasons did not actually motivate the discharge, or (3) they were insufficient to motivate discharge. *Id.* at 1084 (citation omitted).

Plaintiff argues there are material facts in dispute about whether she actually linked the check card to the custodial account that was used to withdraw more than $1,000.00. In other words, the reasons for discharge have no basis in fact. Plaintiff argues six check cards were issued to Watkins, of which two were linked to the custodial account and used to withdraw funds, but Defendant has not shown any documentation showing Plaintiff issued either of these cards (Court File No. 26, p. 23-24). Defendant contends check card number 4229620008009526 was used to withdraw over $1,000.00 from the custodial account and this card was the one issued by Plaintiff. After a careful review of the evidence, it is clear check card number 4229620008009526 was used to withdraw over $1,000.00, and it is likely Plaintiff actually issued the check card. An exhibit to Jones' deposition is a charge off receipt signed by Sylvester. On the receipt is a notation that the aforementioned check card was issued by Plaintiff (Jones Dep., Exh. 5). At the time the receipt was made, Sylvester had no knowledge of the protected activity and therefore no improper motive to falsify the charge off receipt. When Sylvester was questioned about how she determined Plaintiff was the one who issued the card, she testified   Plaintiff's unique identification number ("T

17

number")[5] was associated with the check card (Sylvester Dep. 154-55, 162-67, 182-84).  In addition, current ABOM, Michelle Spencer ("Spencer"), testified that current bank records show Plaintiff's T number is associated with the check card in question (Spencer Aff. at ¶ 6).  Lastly, in her deposition, Plaintiff never denies linking the check card in question to the custodial account.  Thus, the Court cannot conclude the decision to terminate Plaintiff has no basis in fact.

Next, Plaintiff argues even if Defendant had a basis for believing she linked the check card in question, such action on her part was insufficient to motivate discharge or it did not actually motivate the discharge.[6]  She argues she had a spotless employment record prior to this incident and no prior non-credit losses.  The check card setup system did not tell her the other account was custodial and Jones, an ABOM, told her the computer should not have allowed her to link the check card.  Other check cards were issued to Watkins and at least one of those was linked to a custodial account that resulted in a loss of $600.00 but no disciplinary action appears to have been taken. Further, Watkins had an owners account which suggested a check card could be linked to his other account.  In sum, there were several mitigating circumstances suggesting Defendant's decision to terminate was pretextual.

Normally courts do not second guess management decisions of a company.  *Smith v. Leggett Wire Co.*, 220 F.3d 752, 763 (6th Cir. 2000) (holding it is inappropriate for the judiciary to

---

[5] Apparently, each employee is assigned a unique identification number.  When an employee processes a check card request, their unique number is associated with the check card.  Thus, if any question arises about who issued a check card, the bank can look at the employee identification number associated with the relevant check card.

[6] Plaintiff points to Sylvester's poor treatment of her (*see* **§ II** of this memorandum) as evidence of pretext.  However, it is undisputed that Sylvester had no knowledge of the complaints about Moore.  Therefore, whether Sylvester singled out Plaintiff or treated her meanly is irrelevant.

"substitute its judgment for that of management"). However, when the plaintiff is attempting to establish pretext in response to a company's business decision, the reasonableness of that decision can be considered "to the extent that such an inquiry sheds light on whether the employer's reason for the employment action was its actual motivation." *Wexler v. White's Furniture, Inc.*, 317 F.3d 564, 576 (6th Cir. 2003). After reviewing Defendant's decision under this standard, the Court believes a reasonable juror could find Defendant's explanation to be pretextual.

In addition to the above factors, Plaintiff points out a few[7] employees with non-credit losses over $1,000.00 who were not terminated and a few other employees with losses over $1,000.00 who were not terminated are also mentioned in the Jones deposition. However, the employees referenced are tellers, not financial service associates. As Defendant adequately points out, a teller is not similarly situated to Plaintiff because a teller is constantly engaged in monetary transactions and does not link check cards to accounts. Mitigating circumstances for tellers would likely be different than for financial service associates. Further, tellers and financial service associates have much different responsibilities. Thus, the teller employees are not relevant to Plaintiff's pretext argument. *See Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) (explaining plaintiff must show the other employees are "similarly-situated in *all respects*" meaning "all *relevant* aspects of [her] employment situation were 'nearly identical') (first emphasis added) (quotations omitted). Regardless, even without the teller evidence, the Court believes Plaintiff has met its

---

[7] Plaintiff states in her response fifteen bank employees in 2004 had non-credit losses over $1,000.00 and were not terminated (Court File No. 26 p. 8). However, whatever documentation Plaintiff was relying on to make this statement has not been given to this Court. Without this documentation, this Court has no way of knowing whether these employees were similarly situated to Plaintiff. Therefore, for purposes of this summary judgment motion, those employees will be ignored.

burden for purposes of this motion.

Accordingly, the Court will **DENY** summary judgment on the retaliation claim.

### 3. Intentional Infliction of Emotional Distress

In *Miller v. Willbanks*, 8 S.W.3d 607, 612 (Tenn. 1999), the Tennessee Supreme Court enumerated the elements of a claim for intentional infliction of emotional distress. A plaintiff is required to show "(1) the conduct complained of must be intentional or reckless; (2) the conduct must be so outrageous that it is not tolerated by civilized society; and (3) the conduct must result in serious mental injury to the plaintiff." *Id.* Assuming the alleged conduct in this case was outrageous, Plaintiff's claim must fail because she does not present or point to any evidence showing serious mental injury. *See Id* at 615, n. 4 (stating one way to prove serious mental injury is to show "that a plaintiff has suffered from nightmares, insomnia, and depression or has sought psychiatric treatment" and noting "we emphasize that the evidence must establish that the plaintiff's mental injury is serious or severe"); Barbee *v. Wal-Mart Stores, Inc.*, 2004 WL 239763, at *3 (Tenn. Ct. App. Feb. 9, 2004) (affirming grant of summary judgment on intentional infliction of emotional distress claim where plaintiffs complained of embarrassment and humiliation, but presented "no further proof as to any additional mental injury").

Accordingly, the Court will **GRANT** summary judgment on Plaintiff's intentional infliction of emotional distress claim.

### 4. Loss of Consortium

Mr. Chapman asserts a claim for loss of consortium against Defendant. Defendant argues this type of loss of consortium claim is not recognized in Tennessee. Mr. Chapman does not respond

to Defendant's argument in its brief nor does Mr. Chapman's brief address the loss of consortium claim.  Further, Mr. Chapman has not put forward any evidence to support his claim.  Therefore, the Court will **GRANT** summary judgment on Mr. Chapman's loss of consortium claim.


IV.     <u>CONCLUSION</u>

For the reasons stated above, the Court will **GRANT IN PART** and **DENY IN PART** Defendant's motion for summary judgment.  Plaintiff's intentional infliction of emotional distress claim and Mr. Chapman's loss of consortium claim will be **DISMISSED**.  Plaintiff's claim for hostile work environment and retaliation will proceed to trial.

An order shall enter.


*/s/*
**CURTIS L. COLLIER**
**UNITED STATES DISTRICT JUDGE**